UNITED STATES DISTRICT COURT        SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Hallmark Restoration Group, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| versus | § | Civil Action H-09-59 |
| | § | |
| Canchola Properties, LLC, | § | |
| | § | |
| Defendant. | § | |

## Opinion on Summary Judgment

1.    *Background.*

Canchola Properties, LLC, owns the Viento Serrano apartments in Galveston, Texas. These apartments had wind and storm insurance coverage. In October of 2008, Canchola hired Hallmark Group to repair the damage to the apartments caused by Hurricane Ike. The contract assigned Canchola's insurance proceeds for work done on the property to Hallmark. Not happy with the work, Canchola fired Hallmark in early November, one month after hiring it. Canchola did not pay Hallmark.

On November 5, 2008, Hallmark Synergy Group, doing business as Hallmark Construction Group, assigned its rights to collect proceeds to Hallmark Restoration Group, LLC. Hallmark Restoration Group, LLC, sued Canchola Properties, LLC, John Canchola, Efren Canchola, Farmers Insurance Company, Fidelity National Insurance Company, Texas Windstorm Insurance Assoication, and Litton Loan Servicing, LP, for the insurance proceeds. After the defendants removed the suit, Hallmark dismissed everyone except Canchola Properties, and the court ordered Litton Loan to pay the insurance proceeds into the registry of the court.

2.    *Evidence.*

Over a tedious year, Hallmark was unable to produce a single reliable record of the work that they did on the property. Instead, it tendered to the court doctored invoices, thin excuses, and irrelevant information. It wanted to rely solely on the contract language assigning the

insurance proceeds.  As Canchola repeated, the contract assigned the proceeds for work done – work that Hallmark cannot prove it did.

Hallmark, like many in the construction industry, prepares bids using a software program called Exactimate.  Exactimate averages current prices for specific items and services.  It accounts for market fluctuations and geographic variation.

Canchola's technician examined Hallmark's Exactimate entries and found problems ranging from sloppy inaccuracies to fraudulent entries.  On the omission side, Hallmark did not subtract windows or doors from the square feet of the walls, resulting in a systemic overcharge for scraping and painting in every unit.  More disturbing, Hallmark used Exactimate prices for high-grade items but then changed the description read as low-grade or standard items.  Hallmark would use the code for higher capacity generators than those on site.  It would also charge trailers to each apartment unit when only one was needed for the whole project.  Its invoices are purely fictitious.

After being ordered by this court again to substantiate its claims, Hallmark sent a technician to the property in August of 2009 – nine months after Hallmark was run off the job.  The technician's report reflects what he would have done had he bid for the job.  He did not evaluate the work that Hallmark did.  On the other hand, Canchola's technicians methodically created checklists that showed that most of Hallmark's invoices were for work that had not been performed.

Canchola's computer technician also reported that Hallmark's subcontractors were not forthcoming with electronic data that would support their invoice amounts.   One subcontractor's hard drive was reformatted two days after Canchola noticed three depositions.  The technician concluded that there was no functional reason to have reformatted the hard drive.  He also noted that the electronic data from two computers showed that there were shared drives containing documents about the Canchola project.  Those drives were not produced.

The labor records were no better.  The court requested time sheets, work orders, crew assignments, or other bills from the labor subcontractor, Roadrunner, Inc.  In response, Roadrunner produced a list of its employees.  When questioned by the court, it said that it had actually gotten workers from another subcontractor, TransTexas, and had no control over the maintenance of that company's records.  The court then ordered it to get TransTexas' records.  Only one document out of two thousand resembled a time sheet for the Canchola project.

Notably, TransTexas and Hallmark share an employee, Daniel Mendoza, and TransTexas' facsimile number is the same as that for Roadrunner's Dallas office. The companies have a circular relationship. Their difficulty in substantiating their purported expenditures is not just implausible – it is suspect.

Because these records are woefully inadequate and devoid of factual basis, Hallmark will take nothing from Canchola. Canchola will recover its technicians' costs from trying to pry any hard data from Hallmark's grasp. Those costs will be included in the final judgment.

3.    *Conclusion.*

Because it has no credible evidence to support its demand for payment, Hallmark Restoration Group, LLC, will take nothing from Canchola Properties, LLC.

Signed on April 26, 2010, at Houston, Texas.

Lynn N. Hughes
United States District Judge