UNITED STATES DISTRICT COURT          SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Hallmark Restoration Group, LLC, *et al.*, | § § § | |
| Plaintiffs and Counter-Defendants, | § § | |
| *versus* | § § | Civil Action H-09-59 |
| Canchola Properties, LLC, | § § | |
| Defendant and Third-party Plaintiff, | § § | |
| *versus* | § § | |
| Jason Freeman and Robert McGowen, | § § | |
| Third-party Defendants. | § § | |

## Findings and Conclusions

1.     *Background.*

Canchola Properties, LLC, owns the Viento Serrano apartments, a five-building complex in Galveston, Texas. Hurricane Ike damaged the apartments; particularly, the roof on building 5510 was leaking.

Jason Freeman owns and operates a number of construction and restoration companies under the name Hallmark. He and his wife own no fewer than fourteen separate Hallmark entities, either individually or through their holding company, Hallmark Capital Group, LLC. While Capital was formed in 2002, the majority of the Hallmarks were formed in 2007-2008.

Canchola signed a repair contract for each of the five buildings with an entity called Hallmark Group on October 1, 2008. According to Jason Freeman, Hallmark Group is a logo used by all Hallmark companies. It does not have a corporate existence. Canchola fired Hallmark Group on November 4, 2008. That same day, Freeman created Hallmark Restoration Group, LLC. The next day, Freeman assigned the five repair contracts from Hallmark Synergy Group, LLC, to Hallmark Restoration Group, LLC. Hallmark Synergy Group also used the name Hallmark Construction Group, yet neither of these company appear on the contract.

After the assignment, Hallmark Restoration Group sued Canchola for breach of contract. It demanded over one million dollars for "work done" on the property.

2.    *Canchola's Damages.*

    A.    *Roof.*

The little work that was done on the apartments was done poorly – especially to the roof of building 5510. First, Hallmark failed to protect the upstairs apartments from the weather while it removed the damaged roof. Efron Canchola testified that the upstairs apartments were exposed to the elements for nearly two weeks, allowing rain to enter and damage the interior of the upper level.

After Hallmark completed the new roof, Efron Canchola complained to Hallmark's superintendent about the quality of its construction. Not persuaded that his concerns were being heeded, he climbed to the top of this brand-new roof and flooded it with a garden hose, revealing that it leaked. Because Efron Canchola was right, Hallmark then had to patch this brand-new roof.

Canchola says that this all caused $115,728 of damage to the upper apartments in building 5510. Hallmark admitted that it failed to cover the roof for part of its construction time; it will be responsible for the damage.

    B.    *Walls.*

Canchola says that Hallmark damaged some of the internal walls in the apartments by beating them with hammers. Canchola had wanted Hallmark to use diamond saw blades. Hallmark's project superintendent, Edgar Guerrero, said that he told workers to use hammers. Daniel Mendoza, an employee of both TransTexas, a labor supplier, and Hallmark, said that they used the hammers alternately to release humidity trapped behind the walls and for safety because they thought that gas was leaking behind the walls. Hallmark's own hired technician said that this was not a proper construction technique for either purpose. Had there been a gas leak, cigarette-smoking workers hitting concrete with hammers would have generated plenty of sparks.

Hallmark's clattered explanation rang completely hollow when Canchola showed that there were saw marks on the concrete left by Hallmark. Hallmark had no safety concerns; it

was taking an ill-advised shortcut. It damaged the walls and then had its employees fabricate excuses on the witness stand.

Canchola's technician estimated that the damage caused by hammering the walls is $69,797. Hallmark petulantly denied liability and did not present a different figure. Canchola will recover $69,797 for the beaten walls.

      C.     *Rent.*

Many of Canchola's tenants left their apartments after the hurricane. Hallmark delayed their return twice: first, through bad workmanship; second, by bringing a meretricious suit that froze Canchola's insurance proceeds in the registry of the court.

Hallmark had estimated that it would be done working by January 1, 2009. Far from completing the project, Hallmark had damaged the property, was told to leave the site, and sued everyone it could think of: Canchola Properties, the Cancholas individually, the mortgage servicer, and the insurance companies. The court ordered the mortgage servicer who held the disputed insurance proceeds to deposit the money into the court's registry. As a result, Canchola did not receive all of its insurance money until the end of November 2009, delaying repairs to the property and the return of its tenants. Canchola's lost rent is a consequence of Hallmark's suit.

Canchola's ledgers show that its rental income was around $20,000 per month before the hurricane. During 2009, Canchola received around $4,000 in rent each month. Canchola will recover the difference – $16,000 a month, for the months that Hallmark caused the insurance proceeds to be frozen, subtracting the months of lost rent that Canchola would have incurred even with proper restoration.

Keeping in mind that contractors rarely complete their work by the date estimated in the contract, a reasonable restoration would have taken four months, or until February, 2009. Beyond that time, Canchola could not completely restore its premises without its insurance proceeds. The court ordered the final disbursement on November 25, 2009, and the funds were released on December 3. Hallmark is responsible for the lost rent during that time: February through November is 10 months and $160,000 of lost rent.

Although the court periodically released some of the insurance proceeds to Canchola in May, June, and August, the lost rent cannot be pro-rated to match the court's disbursements. Canchola needed all the proceeds to fix all of the apartments. It would not have been able to

obtain an occupancy permit for half-fixed wiring and plumbing. Canchola will recover the full $160,000 of estimated lost rents.

      D.    *Mortgage Late Fee.*

Canchola was also late on its mortgage payments because its money was in the registry. A statement from the mortgage servicer shows that as of January 20, 2010, Canchola had incurred $2,820.54 in late fees on $710,670.61 of principal and would incur an additional $470.09 if its mortgage was not paid in full by January 31. Hallmark will pay Canchola's late fee of ($2,820.54 + $470.09) $3,290.63.

The sum of the physical damage, lost rent, and mortgage late fees is $348,815.63.

3.    *Attorney Fees and Costs.*

Canchola will recover its fees and costs. This includes the  fees and costs of its current attorneys ($132,219.72), the fees and costs of its former attorneys ($20,648.79), the fees and costs billed to it by its mortgage-servicer ($26,541.67), and its costs for electronic data analysis ($16,009.25). These fees are directly attributable to the defense of Hallmark's suit. Hallmark will bear the sum of Canchola's attorney fees and costs – $195,419.43.

4.    *Hallmark Group = Jason Freeman + Robert McGowen.*

Robert McGowen owns Roadrunner, Ltd., and Flous Transportation, Inc. Roadrunner and Flous are moving and storage companies. Hallmark leased equipment from Roadrunner. McGowen also owns Family Warehouses, Ltd., a holding company registered with the Secretary of State at his home address in Sugar Land. In October of 2008, Family Warehouses loaned $350,000 to Jason Freeman on behalf of Hallmark Construction Group. Robert McGowen testified that the loan was not gratuitous – it had a 7% interest rate and was secured by Hallmark's receivables. In January of 2010, Hallmark paid $367,134.32 to Roadrunner. McGowen testified that this was repayment of the loan made by Family Warehouses.

In addition to financing Hallmark's operations, McGowen played a central part in the obfuscation of evidence during discovery. For example, two days after Canchola notified Freeman, Mendoza, Guerrero of their depositions, McGowen reformatted his computer's hard drive. Canchola's computer technician concluded that this computer referred to other drives

that contained Canchola documents – drives that had not been produced and were never produced.

McGowen's companies share physical space with Hallmark. 14245 Chimney Rock is owned by Family Warehouses. Hallmark Restoration Group, Hallmark Capital Group, and Roadrunner, Ltd., are registered at that address with the Secretary of State. Hallmark Synergy Group and Flous Transportation, Inc., are both at 6800 Sandspoint Road. Flous Management, LLC, and Family Warehouses, Ltd., are both registered at McGowen's home address.

The companies have also shared employees. Ryan McGowen, Robert McGowen's son, is the book-keeper for Flous, has a sales position at Roadrunner, and has worked for Hallmark. Ryan McGowen corresponded with John Canchola by e-mail from a Roadrunner domain about the Canchola project.

Most of Hallmark's invoices from the project were from companies owned by McGowen.

The exchange of money, people, and paperwork between Freeman's and McGowen's companies is fluid and pervasive – and in this case, fraudulent. Their interactions are part of an intentional design to confuse billing irregularities and outright inventions for their personal benefit.

There is nothing illegal, or even improper, about owning many interlocking companies. There is nothing wrong about using preferred subcontractors. Nor is there anything wrong about running family businesses.

What is wrong is claiming over one million dollars worth of business done in the span of four weeks and having absolutely no documents to support that claim. Instead, Freeman and McGowen created invoices after the fact, specifically for this case. They would concoct tales about how other people did the work and that was why they had no contemporaneous invoices. Then, it would turn out that those "others" were actually different combinations of the same people, at the same locations. Next, they would say that they did not maintain their records electronically and instead wrote over each invoice when creating a new one. Canchola's technician easily dispelled that idea when he examined the hard drives.

The weight of the evidence shows that Hallmark Group is a partnership of Freeman and McGowen. Freeman and McGowen will be jointly and severally liable for the damages from Hallmark's breach of contract and subsequent misdeeds.

6.      *Conclusion.*

Because the principals of Hallmark Restoration Group, LLC, Flous Transportation, Inc., and Roadrunner, Ltd., operated symbiotically and deceptively for their personal benefit, they will be jointly and severally liable for Canchola's damages, fees, and costs. Canchola Properties, LLC, will take $544,235.06 from Hallmark Restoration Group, LLC, Jason Freeman, and Robert McGowen, jointly and severally.

Canchola incurred these damages in roughly even increments from the date that it terminated Hallmark. To account for the spread of costs over time, it is reasonable to tax pre-judgment interest at one-half of the prevailing rate. Canchola will recover pre-judgment interest from November 4, 2008, at 2.5%. Post-judgment interest will be taxed at 5%.

Signed on May 11, 2010, at Houston, Texas.

_____

Lynn N. Hughes
United States District Judge